**PUBLISHED**

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellant,*

v.

RONALD CORTEZ FOREMAN,
　　　　　　*Defendant-Appellee.*

⎱ No. 03-4375

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Rebecca Beach Smith, District Judge.
(CR-02-210)

Argued: December 5, 2003

Decided: June 4, 2004

Before LUTTIG and GREGORY, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Vacated and remanded with instructions by published opinion. Senior Judge Hamilton wrote the opinion, in which Judge Luttig joined. Judge Gregory wrote a separate opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Brian Lee Whisler, Assistant United States Attorney, Norfolk, Virginia, for Appellant. Walter Bruce Dalton, Assistant Federal Public Defender, Norfolk, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, Norfolk, Virginia, for

Appellant. Frank W. Dunham, Jr., Federal Public Defender, Frances H. Pratt, Research and Writing Attorney, Norfolk, Virginia, for Appellee.

**OPINION**

HAMILTON, Senior Circuit Judge:

The United States appeals from a district court order granting Ronald Cortez Foreman's motion to suppress evidence seized following the search of his Mercury Moutaineer on U.S. Route 13 (Route 13) in Northhampton County, Virginia on June 5, 2002. For the reasons stated below, we vacate the district court's order and remand the case to the district court with instructions to enter an order denying Foreman's motion to suppress.

I

A

At approximately 7:00 a.m. on June 5, 2002, Virginia State Police Trooper C.S. Wade (Trooper Wade) was working a narcotics interdiction assignment on the southbound side of Route 13 in Northhampton County, Virginia, just north of the Chesapeake Bay Bridge.[1] At that

---

[1]Despite Judge Gregory's assertions to the contrary, the facts, as we recite them, are not in dispute for purposes of this appeal. Federal Rule of Appellate Procedure 28(a)(7) obligates an appellant to include in his opening brief "a statement of facts relevant to the issues submitted for review with appropriate references to the record . . . ." Furthermore, although an appellee need only include a statement of facts in his responsive brief if he is dissatisfied with the appellant's version, if the appellee chooses to include a statement of facts in his responsive brief, such statement must conform with Rule 28(a)(7). Fed. R. App. P. 28(b).

Here, Foreman's statement of facts in his responsive brief very closely tracks that of the government, including reciting many sentences nearly verbatim. Pursuant to Federal Rule of Appellate Procedure 28(b), we must consider the facts that Foreman included in his statement of the

time, Trooper Wade observed Ronald Cortez Foreman (Foreman) in a "tense posture" driving a 1997 Mercury Mountaineer, holding the steering wheel with both hands and staring straight ahead as he passed Trooper Wade on Route 13. After following Foreman in his patrol car, Trooper Wade observed two traffic infractions: (1) excessive speed and (2) several air fresheners, hanging from the rearview mirror, obstructing the driver's windshield view, each in violation of Virginia state law. In response to Trooper Wade's activation of his emergency lights, Foreman drove his vehicle partially off the road and came to a stop.

Immediately upon approaching Foreman, Trooper Wade observed Foreman's pulse beating through his shirt, his hands visibly shaking, and the carotid artery on his neck throbbing more noticeably than the "thousands of people" that Trooper Wade had stopped in the past. (J.A. 32). Trooper Wade observed a fold of currency in the center console of Foreman's vehicle, but did not see any luggage.[2]

---

facts as the facts he deems "relevant to the issues submitted for review . . . ." Fed. R. App. P. 28(a)(7). With the exception of a few minor details, the facts, as we recite them, appear in Foreman's statement of facts, and the ones that do not are either ancillary to our legal analysis or are otherwise undisputed. More importantly, the undisputed facts, as we recite them, unquestionably are supported by the record before us.

Moreover, with all due respect to my dissenting colleague, Foreman's responsive brief can in no way reasonably be read to contest the facts that he had already deemed relevant to the issues submitted for review in his statement of facts. For example, the pages of Foreman's brief which Judge Gregory cites as support that Foreman disputes the veracity of Trooper Wade's testimony regarding Foreman exhibiting signs of nervousness do not support such a proposition. Rather, in those pages, Foreman very clearly accepts Trooper Wade's description of him as nervous, as well as the details of that behavior, and only presents arguments concerning the legal significance of his exhibited nervousness.

[2]In an attempt to bolster his dissenting view that reasonable suspicion did not exist to support the brief detention of Foreman and his vehicle in order to conduct the drug dog sniff of the vehicle, Judge Gregory takes time in Part II.A.3 of his dissent to emphasize that the district court found questionable Trooper Wade's testimony that he did not see any

Foreman accompanied Trooper Wade to his patrol car and sat in the passenger seat while Trooper Wade conducted a driver's license check. While Trooper Wade was waiting for the results of the driver's license check, Trooper R.M. Harcourt, Jr. (Trooper Harcourt) arrived on the scene with his drug dog.[3] During the driver's license check, Trooper Wade asked Foreman about his destination. Foreman indicated that he was returning from a one-day trip to New York City to assist his brother who had been evicted on the evening of June 4, 2002. When Trooper Wade spoke of the problem of gun and drug smuggling on Route 13, he observed that Foreman's breathing became heavier and the pulsating of his carotid artery became more obvious. After inquiring about weapons in his vehicle, Trooper Wade inquired about narcotics in the vehicle, to which Foreman responded in the negative. Foreman also indicated that the only money he had was that already seen by Trooper Wade in the center console of the Mercury Mountaineer.

When Trooper Wade ascertained that Foreman's driver's license and registration were in order, he gave him a verbal warning regarding the speeding and windshield obstruction infractions. Trooper Wade returned Foreman's driver's license and registration, after which Foreman thanked Trooper Wade for the warnings and gave him a sweaty handshake. After the handshake, Foreman exited Trooper Wade's patrol car and stated that "he was going to take the air fre-

luggage in Foreman's vehicle during the initial stage of the stop. Whether the district court found this portion of Trooper Wade's testimony questionable is of no moment in the present appeal. First, in Foreman's statement of facts, he states affirmatively that "[t]he trooper . . . did not see any luggage at that point." (Foreman's Responsive Br. at 4). Second, we in no way rely on Trooper Wade's testimony regarding the lack of luggage for our holding that reasonable suspicion existed to support the brief seizure of Foreman and his vehicle in order to conduct the drug dog sniff. Similarly, we do not rely upon Trooper Wade's testimony that he observed a fold of currency in Foreman's center console as part of our reasonable suspicion analysis. Thus, Part II.A.4. of Judge Gregory's dissent has no bite.

[3]At some early point in Trooper Wade's encounter with Foreman, Trooper Wade called for back-up in the form of a drug dog.

sheners down right then." (J.A. 37). At this point, Foreman ostensibly was free to leave.

The following excerpt from the record is Trooper Wade's testimony at the suppression hearing regarding what happened next:

> After he stepped out of the vehicle, which led me to believe that he was leaving, I asked him if I could ask him some more questions, or ask him some questions, and he stated, sure. I then again informed him of the problems of gun and drug smuggling on Route 13 and asked him if I could search his car, and Mr. Foreman initially stated, yeah, and then immediately after that stated, well, no, I don't want anybody searching my car.

(J.A. 37).[4]

As soon as Foreman indicated that he would not consent to the drug dog sniff, Trooper Wade signaled Trooper Harcourt to "run his dog around the exterior of the vehicle." (J.A. 39). Trooper Wade then advised Foreman that he would have the drug dog that was on the scene run around the outside of the vehicle. Foreman nodded and stepped back.

Trooper Harcourt then deployed his drug dog on the exterior of Foreman's vehicle and the drug dog alerted. The parties agree that the duration of time from the initial stop until the drug dog alerted to Foreman's vehicle was approximately ten minutes.

---

[4]At the suppression hearing, Trooper Wade explained that, when a driver is suspected of trafficking drugs, the preferable procedure at a traffic stop is to obtain the driver's consent to search as opposed to ordering a drug dog sniff. To that end, Trooper Wade testified that, at a traffic stop, he often returns the driver's paperwork and allows him to leave his patrol car and start walking away. At that point, when the circumstances of the stop are less (or non) custodial, Trooper Wade asks for the driver's consent to search the vehicle. If the individual does not consent to the drug dog sniff, Trooper Wade will order one if he concludes he has reasonable suspicion to do so.

During the ensuing search of the vehicle, the law enforcement officers recovered $800 in cash, approximately one kilogram of cocaine, and approximately 10.5 grams of cocaine base (crack). After the drugs were discovered, Foreman was arrested.

B

On November 12, 2002, in a one-count indictment, Foreman was charged by a federal grand jury in the Eastern District of Virginia with possession of cocaine with intent to distribute, 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii). On December 17, 2002, Foreman filed a motion to suppress. On January 16, 2003, the district court held a hearing, in which only Trooper Wade and Trooper Harcourt testified. At the hearing, a videotape and its partial audio-track recording of the stop was admitted into evidence.[5]

On January 24, 2003, a superseding indictment for Foreman was returned, adding a count of possession with intent to distribute crack, 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii). On April 1, 2003, the district court ruled on Foreman's suppression motion from the bench, granting the motion to suppress. On April 15, 2003, the United States filed a motion for reconsideration, which the district court denied in a written opinion and order filed on June 6, 2003. The United States filed a timely notice of appeal.

II

On appeal, the United States contends that the district court erred when it granted Foreman's motion to suppress. According to the United States, the seizure of the currency, cocaine, and crack from Foreman's vehicle did not violate Foreman's Fourth Amendment rights. Foreman counters by arguing that the seizure did violate his Fourth Amendment rights.

---

[5]Presumably because neither party deemed the content of the videotape with its partial audio-track recording relevant to the issues on appeal, neither party designated such material nor a copy of such material as part of the joint appendix pursuant to Federal Rule of Appellate Procedure 30.

A

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Temporary detention of an individual during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of a person within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court first held that the Fourth Amendment requires that a brief investigatory stop of an individual be supported by reasonable suspicion. The *Terry* reasonable suspicion standard requires an officer to have a reasonable suspicion that criminal activity is afoot. *Id.* at 30.

Following *Terry*, the law has become well established that during a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation. *United States v. Rusher*, 966 F.2d 868, 876-77 (4th Cir. 1992). Any further investigative detention, however, is beyond the scope of the *Terry* stop and, therefore, illegal unless the officer has a reasonable suspicion of other criminal activity or the individual consents to the further detention. *Id.*; *see also United States v. Sullivan*, 138 F.3d 126, 131 (4th Cir. 1998). The Supreme Court has ruled that a drug dog sniff is not a search within the meaning of the Fourth Amendment. *United States v. Place*, 462 U.S. 696, 706-07 (1983). However, in order to perform the sniff, there must be a seizure of the vehicle and, therefore, the person, requiring either consent to be detained or reasonable suspicion. *United States v. McFarley*, 991 F.2d 1188, 1191 (4th Cir. 1993).

The standard of "reasonable suspicion" as used to evaluate the constitutionality of a *Terry* stop is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life on which reasonable and prudent persons, not legal technicians, act. *Ornelas v. United States*, 517 U.S. 690, 695-96 (1996). The reasonable suspicion standard, like the probable cause

standard, is a fluid concept which takes its substantive content from the particular context in which the standard is being assessed. *Id.*

The Supreme Court has recognized that factors consistent with innocent travel can, *when taken together*, give rise to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9 (1989) ("[A]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."). Thus, *Sokolow* teaches us that it is not enough that Trooper Wade could articulate factors underlying his decision to order the drug dog sniff if Trooper Wade's articulated factors are not probative of behavior in which few innocent people would engage. The articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied.

Notably, the reasonable suspicion standard "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Wardlow v. Illinois*, 528 U.S. 119, 123 (2000). However, the *Terry* reasonable suspicion standard does require "a minimal level of objective justification" for the police action. *Id.*

Because reasonable suspicion is an objective test, we examine the facts within the knowledge of Trooper Wade to determine the presence or nonexistence of reasonable suspicion; we do not examine the subjective beliefs of Trooper Wade to determine whether he thought that the facts constituted reasonable suspicion. *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998). Additionally, it must be noted that, because the *Terry* reasonable suspicion standard is a commonsensical proposition, "[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993).

The determination of whether given facts amount to reasonable suspicion *vel non* is a legal one, which we review *de novo*. *Ornelas*, 517 U.S. at 699. Of course, the factual determinations themselves are given deference. "[A] reviewing court should take care both to review findings of historical fact only for clear error and to give due weight

to inferences drawn from those facts by resident judges and local law enforcement officers." *Id.*

B

In its decision, the district court observed that, once Trooper Wade returned Foreman's driver's license and registration, gave Foreman verbal warnings concerning his traffic infractions, and ostensibly allowed Foreman to leave, the lawful seizure engendered by the traffic stop ended.[6] According to the district court, once the lawful seizure occasioned by the traffic stop ended, Foreman was seized a second time by Trooper Wade, this time to conduct the drug dog sniff. In determining whether this second seizure was permissible, the district court observed that Trooper Wade, like the court itself, was not entitled to rely on any factors tending to show reasonable suspicion that occurred prior to the termination of the traffic stop; rather, the district court concluded that Trooper Wade, like the court itself, was required to look for "consent" or "additional suspicion" that could justify a second seizure. (J.A. 136). Concluding that there was no consent and no additional suspicion occurring after the traffic stop ended, the district court held that the second seizure of Foreman to permit time to conduct a drug dog sniff violated Foreman's Fourth Amendment rights.

C

The parties agree that Foreman did not consent to the drug dog sniff. Consequently, the Fourth Amendment issue in the case turns on whether Trooper Wade had reasonable suspicion to order the drug dog sniff. Before we can address this question, though, we must

---

[6]In its decision, the district court concluded that Trooper Wade's initial traffic stop of Foreman was lawful because Trooper Wade had objective reasons for executing the stop: "Foreman was speeding, and there were windshield obstructions in violation of the Virginia Code." (J.A. 130). Neither party takes issue with this conclusion reached by the district court. Additionally, we note that while Judge Gregory, in dissent, makes much to do about a "pretexual stop" by Trooper Wade, he concedes, as he must, that "the legality of the initial stop is not in dispute." *Post* at 17 n.3.

address a more abstract analytical question raised by the district court's analysis in this case. That is, we must address whether it was appropriate for the district court, in determining whether there was reasonable suspicion for the drug dog sniff, to ignore all of the events which occurred before the time Trooper Wade returned Foreman's paperwork and allowed him to exit his patrol car, *i.e.*, ostensibly allowing Foreman to leave.

The district court did not cite any case law supporting the proposition that it was required to ignore all of the events which occurred before the time Trooper Wade ostensibly allowed Foreman to leave. We are aware of none. In fact, the Tenth Circuit has held that the termination of a traffic stop does not immediately negate the objectively reasonable suspicions developed by a police officer during a traffic stop. *United States v. Williams*, 271 F.3d 1262, 1271 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002).

In *Williams*, the defendant was stopped for speeding by a Kansas Highway Patrol Trooper. *Id.* at 1264. In the mind of the trooper, several factors during the stop added up to reasonable suspicion that the defendant was involved in drug trafficking. First, the trooper noticed at the outset of the stop that the defendant exhibited extreme nervousness, which never dissipated throughout the entire stop. *Id.* at 1265. Second, the trooper noticed a walkie-talkie type radio commonly used by people traveling in tandem on the front passenger seat. *Id.* Third, in lieu of a vehicle registration card, the defendant handed the trooper a rental agreement which bore a different name than the one on the defendant's valid driver's license. *Id.* Finally, the defendant's travel plans, as articulated by the defendant to the trooper, were unusual. *Id.*

Despite the trooper's suspicions of criminal activity, the trooper returned the license and rental agreement to the defendant. *Id.* "In addition, the [trooper] said something to the effect of, 'Thanks a lot. We'll see you.'" *Id.* However, the trooper then asked the defendant's permission to ask him a few questions. *Id.* The defendant agreed. *Id.*

The trooper first asked whether the defendant was carrying any contraband or large amounts of cash to which the defendant replied no. *Id.* The trooper then asked the defendant if he could search the vehicle. *Id.* The defendant refused. *Id.* At that point, the trooper

informed the defendant that he would detain him until a canine unit could arrive at the scene and sniff the outside of the vehicle. *Id.* Approximately fifteen minutes from the time of the initial stop, the canine unit arrived and eventually alerted to the trunk area of the vehicle. *Id.* "After obtaining the keys and opening the trunk, the [trooper] discovered several large bales of marijuana." *Id.*

Following his arrest, the defendant moved to suppress the marijuana as evidence. The district court held that the trooper possessed sufficient reasonable suspicion to further detain the defendant for the purpose of the drug dog sniff. *Id.* at 1266. In so holding, the district court relied upon factors that occurred prior to the trooper returning the defendant's travel documents and verbally indicating that he was free to leave. *Id.*

On appeal before the Tenth Circuit, the defendant challenged the denial of his motion to suppress, *inter alia*, on the ground that the trooper's return of his travel documents and verbal indication that he was free to leave nullified any of the suspicion that had developed throughout the stop. *Id.* at 1270-71. In rejecting the defendant's argument, the Tenth Circuit stated:

> Mr. Williams fails to cite any case, nor can we find any, suggesting that the return of such documentation negates an officer's objectively reasonable suspicions developed during a traffic stop. Although the record indicates that the [trooper] subjectively intended that Mr. Williams was free to go, the relevant inquiry in this case is based on the objective facts known to the [trooper], not upon the [trooper's] subjective state of mind. . . . Whether the [trooper] never intended to release Mr. Williams or whether he simply changed his mind after the consensual questioning does not alter our analysis if the [trooper] already had sufficient reasonable suspicion to detain Mr. Williams for the purpose of the canine drug search. We therefore conclude that the [trooper's] indication to Mr. Williams that he was free to leave bears no significance in our determination of whether the [trooper] had reasonable suspicion to detain Mr. Williams.

*Id.* at 1271. We find the *Williams* decision persuasive and conclude that the district court should have examined all of the circumstances surrounding Foreman's encounter with Trooper Wade in determining whether there was reasonable suspicion for the drug dog sniff.[7]

D

The remaining question in the case is whether Trooper Wade had reasonable suspicion to order the drug dog sniff. The United States argues that the following factors, when taken together, constitute reasonable, articulable suspicion for the brief, additional detention necessary to conduct the drug dog sniff of Foreman's vehicle: (1) Foreman's unusual travel explanation that he traveled from Norfolk, Virginia to New York City (a major source city) and back (approximately seven hours each way) within a single day to visit his brother who was purportedly evicted; (2) Foreman's tense posture while driving; (3) physical signs of extreme nervousness on the part of Foreman throughout the stop (*e.g.*, heavy breathing, heavy sweating, and pulsating of the carotid artery), which physical signs of nervousness grew worse when Trooper Wade raised the issue of drug smuggling on Route 13 where the stop occurred; (4) the multiple air fresheners hanging from Foreman's rearview mirror that are often used to mask

---

[7]We also note that the district court's chosen analytical path was obviously influenced in part by its distaste of Trooper Wade's law enforcement technique of releasing an individual following a traffic stop in order to aid in obtaining the individual's voluntary consent for a drug dog sniff of his vehicle. According to the district court, Trooper Wade could not play this "cat and mouse game—now you're free to go, now you're not" because it did "not advance the interests of justice," nor did it "preserve those rights promised under the Fourth Amendment." (J.A. 135-36). For obvious reasons, the district court was not at liberty to ignore all of the events which occurred before the time Trooper Wade ostensibly allowed Foreman to leave because Trooper Wade employed a minor act of trickery. Indeed, the "use of trickery is an accepted tool of criminal law enforcement." *Alexander v. DeAngelo*, 329 F.3d 912, 917 (7th Cir. 2003); *see also United States v. Orso*, 266 F.3d 1030, 1039 (9th Cir. 2001) (*en banc*) (false statement that witness had seen him with a gun was not coercive), *cert. denied*, 537 U.S. 828 (2002); *Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998) (lie regarding fingerprint evidence).

the smell of narcotics;[8] and (5) Trooper Wade's experience with drug interdiction that Route 13 had become a frequented corridor for illegal narcotics flowing from New York City and other points north to the Tidewater area of Southeastern Virginia.

Foreman responds by offering innocent explanations for each of the factors relied upon by the United States. Notably, Foreman concedes that his explanation of his trip to New York City is "unusual." Appellee's Br. at 17. He, nonetheless, discounts its importance on the basis that his explanation "is not inherently implausible." *Id.*

In our opinion, the factors cited by the United States eliminate a substantial portion of innocent travelers and, therefore, amount to reasonable suspicion that Foreman was engaged in drug trafficking. It is important to remember that, in making our reasonable suspicion determination, we must examine the totality of the circumstances, meaning that reasonable suspicion may exist even if "each of the[ ] factors alone is susceptible of innocent explanation." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). Thus, to begin with, the vast majority of innocent travelers do not and would not drive seven hours to New York City, stay only a few hours, and return. This highly unusual travel plan coupled with the following factors, when viewed

---

[8]Foreman claims the United States waived its right to rely on the presence of the air fresheners in his vehicle by failing to rely on this factor below. Foreman is incorrect on this point. The record shows that the United States did indeed rely below on the presence of the air fresheners in Foreman's vehicle as one of the factors adding up to reasonable suspicion to seize briefly Foreman and his vehicle in order to conduct the drug dog sniff of Foreman's vehicle. (J.A. 124).

The fact that the government did so in its motion for reconsideration of the district court's suppression order as opposed to at the suppression hearing itself is of no moment because the district court obviously excused any default on behalf of the government when it addressed the government's arguments head-on in ruling on the motion for reconsideration. *Cf. Holland v. Big River Minerals Corp.*, 181 F.3d 597, 605 (4th Cir. 1999) ("[A]n issue presented for the first time in a motion pursuant to Federal Rule of Civil Procedure 59(e) generally is not timely raised; accordingly, such an issue is not preserved for appellate review unless the district court exercises its discretion to excuse the party's lack of timeliness and consider[s] the issue.").

objectively, are sufficient to create a reasonable suspicion that criminal activity is afoot: (1) New York City is a known source city for illegal narcotics, *United States v. Bueno*, 21 F.3d 120, 121 (6th Cir. 1994) (New York City "is a known source city for narcotics."); (2) Foreman had several air fresheners commonly used to mask the smell of narcotics hanging from his rearview mirror, *United States v. Foley*, 206 F.2d 802, 804, 806 (8th Cir. 2000) (air freshener hanging from rearview mirror added to reasonable suspicion determination of drug trafficking because air fresheners are often used to mask the smell of narcotics); (3) Foreman was exceptionally nervous and became even more so when Trooper Wade raised the issue of drug trafficking on Route 13, *United States v. LeBrun*, 261 F.3d 731, 734 (8th Cir. 2001) (defendants' exceptional nervousness during traffic stop (*e.g.*, sweating profusely on a cold day, hands shaking) and increased agitation when asked routine questions by officer about travel plans and purpose of trip added to reasonable suspicion determination of drug trafficking); and (4) Trooper Wade's experience with drug interdiction that Route 13 had become a frequented corridor for illegal narcotics flowing from New York City and other points north to the Tidewater area of Southeastern Virginia, *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) ("characteristics of the area in which [the officers making stop] encounter a vehicle" is significant factor in formulation of reasonable suspicion); *Lender*, 985 F.2d at 154 ("Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street."). Finally, we note that Foreman has not cited any case law finding reasonable suspicion lacking under the same or a materially similar factual scenario.

We note that similar to the legal arguments made by Foreman in this appeal, our dissenting colleague attempts to show that reasonable suspicion did not exist by attacking the factors upon which we rely one factor at a time. Of course, this is not the proper analytical framework for determining whether reasonable suspicion supports a *Terry* stop, which proper analytical framework the Supreme Court has repeatedly admonished involves a totality of the circumstances inquiry. *See, e.g.*, *Arvizu*, 534 U.S. at 277. While the dissent takes great pains to point out discrepancies in Trooper Wade's testimony and the district court's skepticism of some of that testimony in an effort to forecast that the district court would discredit other portions of Trooper Wade's testimony if given the chance on remand to do so,

the bottom line is that the existence of the factors that we rely upon to hold that reasonable suspicion existed to support the *very brief* detention of Foreman and his vehicle in order to conduct the *minimally intrusive* drug dog sniff of the exterior of his vehicle are not in dispute.

Finally, we observe that in an attempt to buttress his case for suppression of the evidence, Judge Gregory assumes the posture of the advocate, taking notice of facts outside the record and proffering arguments that Foreman himself did not make before the district court nor this court. For example, the dissent relies upon extra-record weather reports to offer an innocent explanation for Foreman's sweatiness at seven o'clock in the morning. The point wholly missed by the dissent is that, while the court can take judicial notice of the temperature that day, Foreman never argued that his sweatiness was due to warm weather as opposed to being a physical manifestation of nervousness. Indeed, Foreman does not contest on appeal Trooper Wade's description of his nervous behavior.[9]

### III

To sum up, we hold that Trooper Wade had reasonable articulable suspicion to order the drug dog sniff of Foreman's vehicle. For that reason, we vacate the district court's order granting Foreman's motion to suppress and remand the case with instructions to dismiss Foreman's motion to suppress.

*VACATED AND REMANDED WITH INSTRUCTIONS*

---

[9]We also note that the newspaper article containing statistical information regarding air fresheners cited by Judge Gregory, post at 32, is also outside the record. More importantly, such statistical information is not the type of evidence that is subject to judicial notice under Federal Rule of Evidence 201. *Id.* (providing, among other things, that for a court to take judicial notice of a fact it "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

GREGORY, Circuit Judge, concurring in part and dissenting in part:

On June 5, 2002, Ronald Cortez Foreman, an African-American male, drove past Trooper Wade on southbound U.S. Route 13 in Northampton County, Virginia. Trooper Wade, assigned to a narcotics interdiction unit, had just completed the search of another vehicle when he observed Foreman drive by while "holding the steering wheel with both hands and . . . staring straight ahead." R. vol. 4 at 2 (Trooper Wade's Virginia State Police Investigation Report dated June 5, 2002). Trooper Wade pulled onto Route 13 and followed Foreman's 1997 Mercury Mountaineer, because of Foreman's "lack of eye contact[1] and his tense posture when he passed by," which Wade testified were "key indicator[s] in the possibility of criminal activity being afoot . . . ." J.A. 52.[2] Trooper Wade testified that he began to follow Foreman to "*see if I could find a violation*," *id.* at 30 (emphasis added), and admitted "[i]n an attempt to find a violation on

---

[1]Trooper Wade's instant reliance on Foreman's lack of eye contact is at odds with the government's stance in other cases, in which officers attempt to ground reasonable suspicion — and sometimes successfully do so — on the fact that an individual looks or stares back at them. *See, e.g.*, *United States v. Holland*, 510 F.2d 453, 456 (9th Cir. 1975) (reversing district court's suppression and finding reasonable suspicion because, among other factors, the vehicle's occupants "stared at the officers for what they believed to be an unusually long time"); *see also United States v. Pratt*, 355 F.3d 1119, 1120 (8th Cir. 2004) (noting that because suspect "looked at officers . . . twice" and jogged to an empty lot, the officers concluded he was trying to avoid them and a *Terry* stop ensued); *Price v. Kramer*, 200 F.3d 1237, 1247 n.12 (9th Cir. 2000); *United States v. Griffin*, 150 F.3d 778, 784 (7th Cir. 1998); *United States v. Madison*, 936 F.2d 90, 91 (2d Cir. 1991).

[2]Before this case, I was not familiar with the notion that compliance with the letter of textbook driver's education instructions would trigger police suspicion, *i.e.*, both hands on the wheel, no rubbernecking. *See, e.g.*, Va. Dep't of Motor Vehicles, *Va. Driver Manual* § 2 (Dangerous Driving Behaviors) (2004) (recognizing the danger of distracted driving and stating "[k]eep your eyes on the road and your *hands* on the wheel at all times") (emphasis added), *at* http://www.dmv.state.va.us/webdoc/citizen/drivers/vadm/vadm2-5.asp; Dep't of Justice (of Montana), Motor Vehicle Div., *Montana Driver License Manual 2002-2003* 52 ("Do not rubberneck at crashes, *someone getting a ticket*, or other roadside activity. Rubbernecking could cause you to be in a crash.") (emphasis added), *available at* http://www.doj.state.mt.us/driving/montanadriverlicensemanual.pdf.

[Foreman's] vehicle . . . *I was going to conduct a pretextual stop*, stop him for a traffic violation, conduct a brief interview of him, see if I observed any indicators of other criminal activity . . . ." *Id.* at 60 (emphasis added). Because Trooper Wade paced Foreman's vehicle at a speed of sixty-four miles per hour over a one-half mile stretch of road where the speed limit was fifty-five, and observed "items hanging from the inside rearview mirror," he activated his emergency lights to make the stop, which Trooper Wade admitted was pretextual. *See* R. vol. 4 at 2.[3]

After making the stop, Trooper Wade requested Foreman's license and registration and ordered Foreman to join the officer in his cruiser while Wade conducted the license check. While in the cruiser, Trooper Wade immediately "informed [Foreman] of the problems of gun and drug smuggling on Route 13," J.A. 34, and asked Foreman if he was carrying drugs or guns. After completing the license check, Trooper Wade returned Foreman's papers and gave him verbal warnings on the traffic violations, however, Trooper Wade continued his detention of Foreman which ultimately led to a dog sniff of the vehicle that revealed Foreman was carrying illegal narcotics.

The majority correctly recognizes, *ante* at 7, that although a dog sniff is not a search requiring probable cause, such a search cannot be effectuated without a seizure of the vehicle, and that such a seizure requires consent or reasonable articulable suspicion. *See United States*

---

[3]Here, the legality of the initial stop is not in dispute. Although Trooper Wade admits the reasons for the traffic stop were pretextual, once he observed Foreman speeding and noticed the state law rear view mirror violation, probable cause arose for the traffic stop. *See Whren v. United States*, 517 U.S. 806, 813 (1996) (rejecting argument that constitutional reasonableness of stops depends on the actual motivation of the officer, and stating "the Constitution prohibits selective enforcement of the law based on considerations such as race" through the Equal Protection Clause, not the Fourth Amendment). Here, while Foreman stated that the "stop was pretextual in nature" and claimed that his vehicle was stopped "because it fit *the profile*," Mot. Suppress at 4 (emphasis added), he asserted that the evidence should be suppressed because the "'pretextual stop' [was] in violation of [his] Fourth Amendment rights," *id.* at 3, but he did not, in the district court or in this court, advance an Equal Protection claim.

*v. McFarley*, 911 F.2d 1188, 1191 (4th Cir. 1993) (citing *United States v. Place*, 462 U.S. 696, 700-01 (1983)). Before the district court, Trooper Wade and the government repeatedly argued that Foreman consented to the dog sniff.[4] In support of this theory, Trooper Wade testified that he asked Foreman if he would consent to the dog sniff, and Foreman "nodded his head up and down . . . ." J.A. 39; *see also id.* at 88 (statement by the Assistant United States Attorney that Foreman consented to the dog sniff). The district court, however, explicitly rejected Trooper Wade's testimony. The district judge stated that she had watched a videotape of the detention filmed from Trooper Wade's cruiser and remarked "I didn't see that on the tape, and [Wade's] notes indicate that he denied the consent to search the vehicle . . . ." *Id.* at 88-89. In ruling from the bench, the court added:

> The only indication [of consent to the dog sniff] is there is some testimony, which is not on the videotape, and I have watched this videotape, I would say, at least three to four times, to try to see everything that's there and everything that is on it. There is testimony about a nod. *There is no evidence of a nod in this case. There is no evidence of it on the tape, and frankly there are some inconsistencies here in this case.*

---

[4]*See, e.g.*, J.A. 43 ("the defendant had been told that he was free to go, and then voluntarily consented to a conversation"); at 44 ("I would submit that the facts of the case are that the defendant agreed to continue his conversation with Trooper Wade, and furthermore agreed to have the drug dog run around his car"); *id.* at 88 ("[I]t was a consensual encounter . . . . The defendant agreed [to answer a few questions], and then [Wade] asked him if he would mind having the dog run around the car, and he nodded his head and he stepped back."); *id.* at 89 ("the defendant did in fact consent to answer questions and did consent to having the drug dog run around his car"); *id.* at 90 ("[Foreman] consented to remain after he was told — not told, but given an indication he was free to go."). The government submitted an entire brief on the consensual nature of the encounter, *see id.* at 98-101, yet only after having its evidence suppressed, and in filing a Motion for Reconsideration, did the government begin to focus on its argument that "reasonable suspicion" provided a basis for the dog sniff. *See id.* at 119-25.

*Id.* at 113 (emphasis added).

Having rejected the consent theory, the district court analyzed this case as two separate detentions[5] — (1) Trooper Wade's initial questioning and license check and (2) Trooper Wade's continued questioning after returning Foreman's papers — because the court found the second detention violative of the Fourth Amendment, it never addressed whether reasonable suspicion materialized. *See, e.g.*, J.A. 136 (Dist. Ct. Slip Op. at 8) (stating that "the court evaluated the *asserted* reasonable suspicion and determined that, as Trooper Wade chose to end the traffic stop, he had, or should have, satisfied any suspicions that he held at that time" without determining the legal effect of such suspicions (emphasis added)). Although I share the district court's concern that an officer's signal that a driver is free to leave may place that driver in a difficult position with regard to reinitiation of detention, I believe the facts before us are insufficient to raise a dissipation problem. On this basis, I join the majority's conclusion in Part II.C that the district court erred by analyzing Foreman's interactions with Wade as two separate incidents.

I cannot, however, join the majority in concluding that "reasonable, articulable suspicion" was present. Unlike in *United States v. Williams*, 271 F.3d 1262, 1271 (10th Cir. 2001), upon which the majority relies, the district court in this case made no findings of fact to support "reasonable suspicion." Nor can we impose such findings on this record.

To support its holding that reasonable suspicion existed, the majority closely adheres to the government's proposed reading of the facts, although the district court did not credit many of the government's factual contentions.[6] To the contrary, based on its review of video and

---

[5]I note that the government urged this interpretation. In its brief in response to Foreman's motion to suppress, the government wrote "because Wade had returned the defendant's documents and told him that he was free to go, Wade had ended his detention and began a consensual encounter before again questioning the defendant about contraband and requesting permission to search the defendant's vehicle." J.A. 24 (Resp. Mot. Suppress at 5).

[6]Admittedly, the Appellee's briefing may be partly to blame for the majority's willingness to accept the government's narrative. For in the

audio tape of the *Terry* stop in question, the district court repeatedly cast doubt on Trooper Wade's credibility and the government's theory of the case — indeed, the district judge defined "much" of the evidence presented by the government as "questionable." Accordingly, when the facts are properly viewed in the light most favorable to Appellee, the prevailing party, the remaining purported indicia of reasonable suspicion are insufficient to support reversal. Thus, I would remand this case for plenary consideration of the issue of reasonable articulable suspicion, and therefore I respectfully dissent.

## I.

The issue before us is whether Trooper Wade's continued detention of Foreman was supported by reasonable suspicion based on specific and articulable facts that criminal activity may be afoot. *Terry v.*

Appellee's opening brief, he largely recites the very statement of the facts which the government presented in its opening brief. *See* Br. of Appellee at 3-7. However, upon a careful reading of Appellee's brief, it is clear that he continued to contest the government's account of the facts. *See id.* at 15-17 (challenging the officer's testimony that defendant was nervous and that his story was inherently suspicious); *id.* at 19 & n.3 (challenging the government's reliance on the presence of air fresheners in the car and questioning the officer's credibility and stating "[t]he government takes issue with the district court's findings as to Trooper Wade's credibility. . . . This Court should give due deference to the district court's findings as to credibility"); *id.* at 22 (arguing that we should carefully review and scrutinize the officer's testimony regarding the reasons for the stop and detention). In fact, Appellee's counsel began his oral argument by emphasizing that we must consider the evidence in light most favorable to the defendant and immediately called into question the officer's credibility and relied on the fact that Judge Smith watched a videotape of the stop and "had some reasons to question Trooper Wade's credibility." Recording of Oral Argument, December 5, 2003. Further, he argued that the district judge "had some problems with Trooper Wade's explanation for how [the sound went dead and] his other discrepancies. I would submit that these discrepancies and contradictions certainly caused the court to have some questions about Trooper Wade's credibility which affected the analysis of the factors supporting reasonable suspicion." *Id.*

*Ohio*, 392 U.S. 1, 30 (1968); *See also Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (discussing "reasonable, articulable suspicion"). During a traffic stop, if the driver presents a valid license, registration and proof that he or she is authorized to drive the car, the driver is free to go. "Any further detention for questioning is beyond the scope of the *Terry* stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime." *United States v. Rusher*, 966 F.2d 868, 876-77 (4th Cir. 1992). In determining whether reasonable articulable suspicion was present, we review the totality of the circumstances in light of the officer's experience. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Sims*, 296 F.3d 284, 287 (4th Cir. 2002). Yet the officer's inferences must be objective and reasonable. *United States v. Cortez*, 449 U.S. 411, 418 (1981).

In this case, the district court's credibility findings regarding Trooper Wade's testimony considerably color the "reasonable articulable suspicion" inquiry. *See United States v. Hill*, 195 F.3d 258, 265-67 (6th Cir. 1999) (noting that an officer's credibility must be scrutinized particularly where a pretextual stop is at issue); *see also United States v. Akram*, 165 F.3d 452, 457-60 (6th Cir. 1999) (Guy, J., dissenting) ("The courts have given the police this extraordinary power to make pretextual stops and searches of vehicles, but it is also the responsibility of the courts to make sure the testimony of police officers is given the same critical scrutiny given to a defendant's testimony."); *United States v. Johnson*, 63 F.3d 242, 247 (3d Cir. 1995) ("[I]n evaluating the constitutionality of a traffic stop, a court is free to examine . . . the officer's credibility."); *cf. Wong Sun v. United States*, 371 U.S. 471, 481-82 (1963) (stating that probable cause determinations shall be made by a neutral magistrate to "insure that the deliberate, impartial judgment of a judicial officer will be interposed between the citizen and the police, to assess the weight and credibility of the information which the complaining officer adduces as probable cause").

In Part II.D, the majority reverses the district court and holds that reasonable suspicion existed to support Foreman's continued detention for the purpose of conducting a dog sniff. On motions to suppress, we review factual findings under a clearly erroneous standard, while reviewing legal conclusions de novo. *Rusher*, 966 F.2d at 873.

Significantly, in our review of motions to suppress, we review the evidence in the light most favorable to the prevailing party below. *United States v. Seidman*, 156 F.3d 542, 547 (4th Cir. 1998).

Accordingly, employing the appropriate standard of review, I turn to Trooper Wade's testimony and the factual circumstances that allegedly support reasonable suspicion. Based upon the facts as found by the district court, including the district judge's conclusions drawn from viewing the videotape of the detention, and the district judge's doubts as to Trooper Wade's credibility, I submit that the majority is left with, at best, three undisputed potential indicia of reasonable suspicion, which — when viewed individually, or in combination — are insufficient to establish reasonable suspicion: (1) Foreman's trip from a purported "source city"; (2) Foreman's travels on southbound Route 13 in Virginia; and (3) the fact that Foreman had one or more air fresheners hanging from his rearview mirror.

II.

A.

In arguing that reasonable suspicion was present, the government presents what it would like us to read as a litany of indicia in support. Yet when those factors are properly weighed in light of the district court's findings of fact, we are left with scant and insufficient evidence of reasonable suspicion. These factual problems are borne out upon review of Trooper Wade's testimony during the suppression hearing. As noted above, Trooper Wade's detention and interrogation of Foreman was captured on a videotape recorder from the police cruiser. That tape and its audio track — which was inaudible — were introduced as evidence at the suppression hearing. The district court found that the tapes and other evidence refuted, or called into question, many of the government's and Trooper Wade's assertions.

1.

First, during the suppression hearing, Trooper Wade testified that the audio track was inaudible because the body microphone used to record the interrogation must have failed because of a dead battery.

*See* J.A. 47-48. The district court, however, rejected Trooper Wade's explanation, noting that the tape was clearly audible when the stop began, *id.* at 80, but the sound vanished when he started interrogating Foreman. *Id.* at 84. In ruling from the bench, the district court explicitly relied on the absence of sound as evidence of inconsistency in Trooper Wade's testimony and the government's case:

> I note that it's the *only* segment on the tape where there is no sound. There are other stops here . . . and if you run [the tape] a little before and a little bit after [the Foreman detention], there is sound *everywhere* else on this tape, but there is no sound on this particular stop. And furthermore, the testimony was that the battery went dead, but there is no indication of a battery going dead.

*Id.* at 114 (emphasis added).

### 2.

Second, as discussed above, the district judge flatly rejected Trooper Wade's testimony and the government's contentions that Foreman consented to the dog sniff. *Supra* at 17-19.

### 3.

Third, the district court rejected Trooper Wade's testimony, J.A. 33, that Foreman's lack of luggage in the car was one indication of reasonable suspicion.[7] The district court cast doubt on Trooper Wade's credibility, stating:

---

[7]Trooper Wade advanced this argument, although in the government's brief in response to Foreman's Motion to Suppress the government did not raise it as an indication of reasonable suspicion. Instead, the government's brief pointed to *only* three indicia of suspicion, namely Foreman: (1) was stopped "on Route 13, a known drug corridor"; (2) made a "very brief trip to New York, a source city for drugs"; and (3) "avoided eye contact" and "exhibited signs of extreme nervousness." J.A. 24 (Resp. Mot. Suppress at 5).

[W]e just saw a videotape. There is a huge white safe in the back of this vehicle. . . . You never made mention of seeing that early on. . . . And yet you say there is no luggage. Let's go on the videotape . . . . What my concern is, Officer Wade, is you said there was no luggage. That was an indicia. You said there was no luggage, because you could see into the vehicle. If you could see into the vehicle, I don't know how in the world you could have missed this big, white safe.

*Id.* at 78-79. Upon further probing by the district judge, Wade admitted the safe "could have been a big metal trunk . . . . [t]hat could have been luggage." *Id.* at 80. In ruling from the bench, the district court memorialized this inconsistency as significant, *id.* at 113-14, and stated that it, like "*much of* [the evidence in the case] is questionable to the court." *Id.* at 115 (emphasis added). *Contra ante* at 3 ("[Trooper Wade] did not see any luggage.").

4.

Additionally, Trooper Wade testified that his suspicions were raised in his initial approach to the vehicle by the "large fold of U.S. currency, a large wad of bills, United States bills. . . . . [I]t appeared to be a large amount of money laying on the center console." J.A. 32; *see also id.* at 21 (Gov't Response Mot. Suppress at 2) (stating that Wade "saw a bundle of money in the center console"). During further questioning of Trooper Wade regarding this purported "fold," "wad," or "bundle," he admitted "it was not a large amount of money." And even after a leading question by the Assistant United States Attorney — "Well it was a large number of bills and not a large amount of money? — Wade admitted that it was "*[s]everal bills*, and less than a hundred dollars." *Id.* at 33 (emphasis added). Thereafter, the district judge questioned Trooper Wade regarding this allegedly suspicious cash on the console and he stated that he thought the amount was $42 and "it was *several bills* folded up together." *Id.* at 35 (emphasis added) (capitalization removed).[8]

---

[8]"Several" is defined as "[b]eing of a number more than two or three but not many" or "[a]n indefinite but small number; some or a few."

Despite the district court's concerns regarding Trooper Wade's credibility, *see, e.g.*, J.A. at 132 n.3 ("The court notes that there were discrepancies in the factors proffered as reasonable suspicion which led to questions of credibility."), and notwithstanding the district court's absence of findings on the matter, the majority accepts Trooper Wade's testimony regarding Foreman's alleged nervousness to support its finding of reasonable suspicion. The majority relies on Trooper Wade's supposed observations that Foreman's pulse beat through his shirt, his hands shook and the carotid artery on his neck throbbed more noticeably than anyone Trooper Wade had stopped in the past. *Ante* at 3 (citing J.A. 32 (Trooper Wade's testimony)). Significantly, in addition to characterizing the government's evidence as "questionable," J.A. 115, the district judge, who had the opportunity to review video of Foreman's appearance and demeanor during the stop, *never* credited Trooper Wade's testimony on these matters.

For example, nowhere did the district court accept Trooper Wade's testimony that when Foreman responded to the question of whether he carried drugs in the vehicle he stated "no, no, no, not that I know of." J.A. 35. To the contrary, in ruling from the bench, the district court stated: "[Trooper Wade] asked Mr. Foreman something about, again, did he know anything about the drugs, and [Foreman] said [']no['] . . . ." *Id.* at 110. Thus, although the government repeatedly relies on this alleged "no, no, no" response to support its argument that Foreman was suspicious because of nervousness, *see, e.g.*, Br. of Gov't at 4; Reply Br. at 9, such an argument is not cognizable given the district court's factual findings.

Furthermore, the majority concludes, based upon Trooper Wade's uncorroborated assertions, that Foreman evidenced nervousness through heavy breathing, heavy sweating, and pulsating of the carotid artery, *ante* at 12, although the district court could have explicitly

---

American Heritage Dictionary of the English Language (4th ed. 2000). By contrast, the same text defines a "wad" as "[a] large amount," "[a] sizable roll of paper money," or "[a] considerable amount of money." *Id.* Further, DEA Task Force Agent Charles Misuna's affidavit regarding the investigation attests that the amount recovered was $44. R. vol. 1, Misuna Aff. ¶ 6 (Oct. 21, 2003).

detailed — and still could upon the remand that I submit must occur — the presence of such facts, based on its multiple reviews of the video tape, were they in existence. Yet by resolving such factual inconsistencies against Foreman, the prevailing party, the majority contravenes our standard of review, *see Seidman*, 156 F.3d at 547, and undermines the district court's well-founded doubts regarding Trooper Wade's testimony on even the most basic and objective facts in this case. In so doing, the majority adopts the role of fact finder, elevating Trooper Wade's testimony to a level of trustworthiness which the district court did not accord, and which, upon appellate review, I believe it does not warrant.

Indeed, even if the facts supported the majority's conclusions, the single case it cites regarding nervousness is unpersuasive. *Ante* at 14 (citing *United States v. LeBrun*, 261 F.3d 731, 734 (8th Cir. 2001)).[9] The majority cites *LeBrun* for the proposition that reasonable suspicion may be evidenced by "defendants' exceptional nervousness during traffic stop (*e.g.*, *sweating profusely on a cold day*, hands shaking) and increased agitation when asked routine questions by officer about travel plans and purpose of trip added to reasonable suspicion determination . . . ." *Ante* at 14 (emphasis added). However, it is unclear how *LeBrun* is applicable given the absence of analogous findings of fact by the district court as well as the undisputed facts in the record.

---

[9]Further, the majority, like the government, seems unmindful of the fact that courts must be skeptical in using nervousness as a factor to determine reasonable suspicion. *See, e.g.*, *Delaware v. Prouse*, 440 U.S. 648, 657 (1979) (stating that a traffic stop is an "unsettling show of authority" that may "create substantial anxiety"); *United States v. Gooding*, 695 F.2d 78, 83-84 (4th Cir. 1982) (holding that defendant's "distraught" and "nervous" demeanor as he deplaned did not amount to reasonable suspicion); *United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003) ("There is no reason why [the officer] should have reasonably suspected that [the suspect's] nervousness was tied to anything other than the fact that he was being momentarily detained by an authority figure with police power over him."); *United States v. Santiago*, 310 F.3d 336, 338-39, 342 (5th Cir. 2002) (holding that extreme nervousness, potentially inconsistent stories, and other suspicious answers did not amount to a reasonable or articulable suspicion).

In fact, after Trooper Wade's testimony regarding Foreman's alleged throbbing neck and heavy sweat, the court asked: "How hot was it that day? . . . . June 5, 2002, could have been pretty hot, couldn't it?" J.A. 32. In this question, the district court implied that she believed these characteristics were attributable to a different scenario. Indeed, on June 5, 2002, Virginia was enveloped by a heat wave. In Norfolk, the temperature reached a record high of 95 degrees in the midst of a week where the temperatures remained in the 90s. *See* Steve Stone, *Temperature Peaks at Record-Tying 95 in Norfolk*, Va. Pilot & Ledger Star, June 6, 2002, at B7, *available at* 2002 WL 5497483; *see also* U.S. Dep't of Commerce Oceanic & Atmospheric Admin., *Unedited Local Climatological Data, Hourly Observations Table, Norfolk Int'l Airport*, June, 2002 (detailing that in Norfolk at 6:51 a.m. on June 5, 2002, the temperature had already reached 76 degrees with a relative humidity of 74 percent). Thus, despite the fact that the stop occurred at 7 a.m., I find the heat and the fact that Foreman had to sit in the car under the sun for more than ten minutes render Foreman's sweat, if it existed, fairly insignificant, and the majority's reliance on *LeBrun* misplaced.[10]

It is unnecessary, however, to refute the government's proposed facts given the district court's findings. Employing judicially noticeable facts, I demonstrate the flaw in Trooper Wade's arguments regarding Foreman's sweat simply because I find it illustrative of other problems the district court found with Trooper Wade's testi-

---

[10]The majority characterizes my reliance on "extra-record weather reports" as "advocacy," stating that "while the court can take judicial notice of the temperature that day, Foreman never argued that his sweatiness was due to warm weather as opposed to being a physical manifestation of nervousness." *Ante* at 15. I have not, however, assumed an advocate's position. To the contrary, my reliance on the weather reports buttresses, not my opinion, but the *district judge's observations* as detailed above. Accordingly, my iteration of these historical facts simply gives deference to the district court's findings and the record's detail that our law requires. Finally, the majority is not mindful of the fact that any argument by Foreman regarding the causes of his sweat would have been redundant, because it was during the first moments of the government's direct examination of Trooper Wade when the district judge interjected to cast doubt upon Wade's testimony that Foreman's sweat was an indication of nervousness. *Supra* at 26 (citing J.A. 32).

mony. As the district court repeatedly recognized, Trooper Wade's testimony — the heart of the government's evidence at the suppression hearing — was laden with inconsistencies. Because the government's contentions regarding Foreman's alleged nervousness and other physical attributes manifesting suspicion are contradicted rather than supported by the district court's findings of fact, and Foreman was the prevailing party below, *see Seidman*, 156 F.3d at 547, I find that the majority errs by accepting them as part of the totality of the circumstances establishing reasonable suspicion.

III.

A

Having demonstrated that the majority's finding regarding nervousness cannot be supported in the record, I proceed to discuss the outstanding factors which the majority concludes support reasonable suspicion. *Ante* at 13-14. As noted above, the outstanding factors are easily grouped into three considerations: (1) Foreman's trip from a purported "source city"; (2) Foreman's travels on southbound Route 13 in Virginia; and (3) the fact that Foreman had one or more air fresheners hanging from his rearview mirror.

1.

I find the "source city" discussion fully unconvincing. We have previously remarked that courts place too much weight on travel from alleged "source cities." *See United States v. Wilson*, 953 F.2d 116, 125-26 (4th Cir. 1991) ("[T]he vast number of persons coming from those 'source cities' relegates this factor to a relatively insignificant role.") (citation omitted); *see also Reid v. Georgia*, 448 U.S. 438, 441 (1980) (holding that defendant's arrival from "source city" was an insufficient foundation for reasonable suspicion and stating the "circumstances describe a very large category of presumably innocent travelers"); *United States v. Beck*, 140 F.3d 1129, 1138 n.3 (8th Cir. 1998) (detailing that a review of case law revealed that officers have termed a significant number of the largest cities in the United States as "drug source cities"); *United States v. Andrews*, 600 F.2d 563, 566-67 (6th Cir. 1979) ("[O]ur experience with DEA agent testimony . . . makes us wonder whether there exists any city in the country which

a DEA agent will not characterize as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center."). Indeed, the justification is used so often by the government, that it becomes difficult to figure out what urban area is *not* a "source city." *See Akram*, 165 F.3d at 459 n.4 (Guy, J., dissenting) ("Every urban area in the country is a source city. This is entitled to little or no weight in my view, unless the person stopped just came from someplace like Medellin, Colombia."); *see also United States v. Townsend*, 305 F.3d 537, 543-44 (6th Cir. 2002) (holding travel from Chicago, a "source city," to Columbus, a "destination city," was not indicative of reasonable suspicion in case where passengers were nervous, lacked vehicle registration and did not know their destination address). The characterization of travels — even "turnaround" travel[11] — from New York City, a city with a massive populace and myriad cultural, commercial and historical wonders, as a "source city" trip is all the more slipshod given the legion

---

[11]The government argues that Foreman's story of a same-day round-trip between Norfolk and New York City to visit his evicted brother was "of dubious plausibility." Reply Br. of Gov't at 10. While the government is correct to cite the general proposition that "turn-around trips" represent one of several factors that can combine to form reasonable suspicion, the government errs by decontextualizing the cases on which it relies. For example, a one-day turn-around trip might be deemed "of dubious plausibility" when paired with other factors. However, given Foreman's proffered explanation, it does not appear objectively strained in this case. Here, Foreman purportedly journeyed to New York City to assist his brother who had just been evicted from his home. Under these circumstances, a trip lasting *longer* than a day might be surprising. I find that Foreman's explanation alone would not raise suspicion because if Foreman's brother had just lost his apartment, he would need to move out quickly, and Foreman would lack a place to stay overnight.

By contrast, the cases cited by the government regarding turn-around trips all feature suspects who, unlike Foreman, proffered inconsistent stories concerning their travels, making the short stays seem of dubious plausibility. *See, e.g.*, *McFarley*, 991 F.2d at 1192 (noting that "over the course of the voluntary questioning [the suspects] provided inconsistent stories about details of their travel"); *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) (inconsistent and contradictory accounts of the travels were at issue); *United States v. Perez*, 37 F.3d 510, 513 (9th Cir. 1994) (same).

of innocent travelers departing New York City. *See United States v. Letsinger*, 93 F.3d 140, 147-48 (4th Cir. 1996) (Hall, J., dissenting) (stating that New York "is also a 'source city' for bagels and stock-brokers" and "*[m]illions* of law-abiding and crime-fearing Americans are from New York City").

2.

I find the government's characterization of southbound Route 13 as "a frequented corridor for illegal narcotics flowing from New York and other points north" equally hollow as a basis for reasonable articulable suspicion. First, the district court gave no indication that it accepted Trooper Wade's testimony on this issue, and the government presented no statistics or other objective evidence regarding Route 13's status as a "drug corridor." Moreover, even if the factor was supportable, *every* southbound car that passed Trooper Wade on that corridor was, by the government's logic, suspicious. Such a broad generalization does nothing to eliminate the overwhelming number of innocent travelers on that corridor. *See Reid*, 448 U.S. at 441; *United States v. Boyce*, 351 F.3d 1102, 1109 (11th Cir. 2003) (holding that travel on a "known drug corridor" did not create reasonable suspicion because the factor was one of several applicable "to a considerable number of those traveling for perfectly legitimate purposes") (internal quotation marks and citation omitted); *United States v. Yousif*, 308 F.3d 820, 828-29 (8th Cir. 2002) (rejecting "drug corridor" factor on the basis that too many people fit such a description for it to justify reasonable suspicion) (citation omitted). Furthermore, given the ubiquity of "source cities," it seems that every traveler on an interstate road in the United States is likely headed in the direction of, or from, a "source city" along that road, ostensibly placing them in a "drug corridor." Finally, the government did not offer any objective evidence of Route 13's status as a "drug corridor," rather the only evidence it presented was the "mere subjective impression[ ] of a particular officer," *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989), whose credibility has been called into question.

### 3.

Lastly, the presence of an automobile air freshener is similarly insignificant. *See United States v. Ten Thousand Seven Hundred Dollars and No Cents in U.S. Currency*, 258 F.3d 215, 228 n.9 (3d Cir. 2001) (rejecting government's reliance on presence of air freshener in vehicle as indication of narcotics nexus).[12] The prevalence of these

---

[12]I find it doubtful as to whether the government may now properly rely on this factor at all. As discussed above, in responding to the motion to suppress, the government never mentioned this factor as one leading to reasonable suspicion. *Supra* note 7. Instead, the government only proffered the air fresheners as a factor supporting the probable cause for the pretextual stop. Only in its Motion for Reconsideration of the district court's suppression order did the government argue that the air fresheners were a factor supporting reasonable suspicion. *See* J.A. 124. Thus, the government's ill-timed reliance on this factor is misplaced. *See Wilson*, 953 F.2d at 124 (noting that we would not consider a factor on appeal which had not been raised at the suppression hearing).

While the majority attempts to distinguish my reliance on *Wilson*, *ante* at 13 n.8, it overlooks the well-established principle that arguments raised for the first time in a motion for reconsideration are generally deemed waived. *See Holland v. Big River Minerals Corp.*, 181 F.3d 597, 605 (4th Cir. 1999) (stating issue first presented in a motion pursuant to Fed. R. Civ. P. 59(e) "is not preserved for appellate review unless the district court exercises its discretion to excuse the party's lack of timeliness and consider[s] the issue"); *see also Mungo v. Taylor*, 355 F.3d 969, 978 (7th Cir. 2004) ("Arguments raised for the first time in connection with a motion for reconsideration, however, are generally deemed to be waived.") (citation omitted); *DiMarco-Zappa v. Cabanillas*, 238 F.3d 25, 33 (1st Cir. 2001) ("To the extent that appellants' reconsideration motion sought to raise an argument waived at the trial stage, it must necessarily fail."); *Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co.*, 124 F.3d 508, n.12 (3d Cir. 1997) (declining to consider on appeal issue raised for the first time in a post-judgment motion); *CMM Cable Rep, Inc. v. Ocean Coasts Props., Inc.*, 97 F.3d 1504, 1526 (1st Cir. 1996) (stating "there is absolutely no merit" to the argument "that we should find [a party's] arguments preserved because they were advanced in its motion for reconsideration"); *Manor Healthcare Corp. v. Guzzo*, 894 F.2d 919, 922 n.4 (7th Cir. 1990) (stating "[r]aising an issue in a motion for reconsideration does not save the issue for appeal") (citations omitted); *Am. Meat Inst. v. Pridgeon*, 724 F.2d 45, 47 (6th Cir. 1984) (holding issue raised for first time in motion for reconsideration constituted waiver); *but see Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*,

devices in American automobiles does little to eliminate innocent travelers within the context of reasonable articulable suspicion. *See Sweet Scents Make Big Cents*, Detroit News, Dec. 10, 2003, at 1G (reporting that American consumers spend more than $330 million annually on air fresheners for their automobiles and prices for such items start at 50 cents). Furthermore, the government asserts that the mere presence of an air freshener is an indicia of reasonable suspicion — Trooper Wade's testimony makes no reference to odor emanating from Foreman's vehicle — whereas courts that have accorded an air freshener any weight in the reasonable suspicion calculus focus on its trigger of the officer's olfactory senses. *See United States v. West*, 219 F.3d 1171, 1178 (10th Cir. 2000) ("The Tenth Circuit has consistently held that the *scent* of air freshener is properly considered as a factor in the probable cause analysis.") (emphasis added) (citing cases); *United States v. Freeman*, 209 F.3d 464, 469 (6th Cir. 2000) (Clay, J., concurring) (referencing court's past reliance on the "strong scent of air freshener" emanating from a vehicle as a factor); *United States v. Pierce*, 152 F.3d 808, 810 (8th Cir. 1998) (noting officer smelled an odor of air freshener coming from inside a van).

B.

While, in the most forgiving light, the majority is left with three factors, which we and other courts have sometimes recognized as rightful considerations in forming reasonable suspicion, each of those factors is relatively minor and often subject to qualification. Even if the combination of the articulated factors were fully supported by the record as it now stands, together they simply cannot "eliminate a substantial portion of innocent travelers," thus reasonable suspicion is

---

334 F.3d 423, 431 n.7 (5th Cir. 2003) ("This court has held that issue raised for the first time in post judgment motions are preserved for appeal.") (citations omitted). As the Seventh Circuit has recognized, "[m]otions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence. *Such motions cannot in any case be employed as a vehicle to introduce new evidence that could have been adduced during pendency of the [original] motion.*" *Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985) (internal quotation marks and citation omitted).

lacking. *United States v. Brugal*, 209 F.3d 353, 361 (4th Cir. 2000) (en banc) (plurality opinion). The factors together amount to little more than a blanket generalization about the nature of certain crimes that fails to provide the specificity which is the hallmark of the Fourth Amendment. *See Cortez*, 449 U.S. at 418. Thus, I conclude that this case should be remanded to the district court so that it may properly examine the testimony, evidence and other fact-finding in which it engaged to determine whether reasonable suspicion ever materialized.

## IV.

For the reasons stated above, I find this record is insufficient for the majority to make a finding of reasonable articulable suspicion. Moreover, in light of the credibility concerns regarding Trooper Wade and the district court's statement that it found "much" of the government's evidence "questionable," it is the district judge — who watched the video of Trooper Wade's detention of Foreman three or four times, J.A. 113, and saw Trooper Wade testify in court — that remains best situated to resolve the many doubts that remain. For these reasons, I respectfully dissent.