**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-4858**

UNITED STATES OF AMERICA,

            Plaintiff - Appellee,

      v.

COREY JERMINE WHITNEY,

            Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at New Bern.  Louise W. Flanagan, Chief District Judge.  (5:08-cr-00108-FL-1)

Submitted:  July 23, 2010            Decided:  August 17, 2010

Before MOTZ and KING, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

Thomas P. McNamara, Federal Public Defender, Stephen C. Gordon, Assistant Federal Public Defender, Raleigh, North Carolina, for Appellant.  George E. B. Holding, United States Attorney, Anne M. Hayes, J. Gaston B. Williams, Assistant United States Attorneys, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Corey Jermine Whitney pleaded guilty to a three-count indictment charging him with drug and gun-related offenses, reserving his right to appeal the denial of his motion to suppress. On appeal, Whitney argues that the district court erred in failing to exclude evidence obtained from Whitney during a traffic stop and, for the following reasons, we affirm.

I.

On appeal, Whitney contests the denial of his suppression motion. We review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Perkins, 363 F.3d 317, 320 (4th Cir. 2004). And, "[b]ecause the district court denied the motion to suppress, we construe the evidence in the light most favorable to the government." Id.

The evidence in this case showed that, on September 14, 2007, Agent John Canady and Lieutenant Angela Bryan of the Johnston County, North Carolina, Sheriff's Department were traveling in an unmarked vehicle on Highway 42 East between the towns of Clayton and Wilson. Shortly after noon, Agent Canady passed a black Cadillac Escalade driving the opposite direction; when Agent Canady looked back at the Escalade in his side-view mirror, he saw a dark spot where the license plate should be and

2

could not tell if the vehicle had a proper license plate. Agent Canady turned around his vehicle and, after several minutes, caught up with the Escalade. From that vantage point, Agent Canady saw that the Escalade did, in fact, have a license plate. Agent Canady called in the license plate and learned that it belonged to a 2001 Lexus. Agent Canady also observed that the license plate was covered by a plastic cover. At that point, Agent Canady activated his blue lights and siren and effected a traffic stop of the Escalade.

Agent Canady, who was in plainclothes, approached the vehicle and asked the driver, Corey Jermine Whitney, for his identification and vehicle registration. Whitney provided Agent Canady with appropriate paperwork, showing that he had purchased the vehicle in August 2007 and had legally transferred the license plate from his wife's 2001 Lexus to the Escalade. Agent Canady took Whitney's license back to the police vehicle to check its validity and any outstanding warrants. Thereafter, Agent Canady returned Whitney's license but, as was his practice, asked Whitney to step out of the vehicle so that he could show Whitney the tinted license plate cover that Whitney would need to remove when he returned home.

While they were at the back of the Escalade, Agent Canady asked if Whitney had any weapons on his person. Whitney responded that he did not and consented to a search of his

3

person. Agent Canady felt a large bulge in both of Whitney's front pants pockets, and Whitney revealed that he was carrying roughly $3000 in cash in his pockets. Agent Canady observed that Whitney was nervous and could see him breathing hard. Agent Canady also noticed the veins in Whitney's neck pulsating slightly. At that point, Lieutenant Bryan asked for consent to search the Escalade. Whitney refused consent and, thereafter, the officers requested a canine unit be dispatched to the scene. The canine unit arrived several minutes later; during a sweep of the Escalade, the canine alerted on the driver's and passenger's sides of the vehicle. A search of those areas revealed a plastic bag containing crack cocaine and a clear plastic bag containing marijuana in one compartment of the center console. In another compartment in the center console, Agent Canady found a Rossi .357 caliber handgun and a purple Crown Royal bag containing powder cocaine, marijuana, and a digital scale.

Thereafter, a federal grand jury in the Eastern District of North Carolina indicted Whitney, charging him with possession of a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924 (2006); possession with intent to distribute more than five grams of cocaine base and cocaine, in violation of 21 U.S.C. § 841(a)(1) (2006); and

4

possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c) (2006).

Whitney filed a motion to suppress the evidence obtained during the traffic stop and, following an evidentiary hearing, a magistrate judge issued a written Report and Recommendation that recommended denying the motion to suppress. In reaching this recommendation, the magistrate judge first concluded that the traffic stop ended when Agent Canady returned Whitney's license, even though he then asked Whitney to exit the vehicle. The magistrate judge further found that Whitney was re-seized when the canine unit was called but, at that point, Agent Canady had reasonable suspicion to seize Whitney because of the $3000 in his pockets and his nervous demeanor.

Whitney filed timely objections to the magistrate judge's Report and Recommendation and, following a de novo review, the district court adopted the Report. Whitney then entered into a conditional guilty plea pursuant to Federal Rule of Criminal Procedure 11(a)(2), pleading guilty to the indictment while reserving the right to appeal the denial of the suppression motion. The district court ultimately sentenced Whitney to 120 months' imprisonment, and Whitney noted a timely appeal.

II.

On appeal, Whitney makes two separate arguments. First, Whitney contends that Agent Canady illegally prolonged the stop by returning Whitney's identification but then requesting that he exit the vehicle to look at the license plate. According to Whitney, at the time Agent Canady decided to return Whitney's license and registration, he did not possess the requisite reasonable suspicion to prolong their encounter and, because Whitney was told to exit the car, the encounter was not consensual. In the alternative, Whitney argues that, even assuming he consented to exiting the car and the search of his person, at the time Whitney refused consent to the search of his vehicle, Agent Canady did not possess reasonable suspicion to detain him until the drug dog arrived.

Following the Supreme Court's decision in Terry v. Ohio, 392 U.S. 1 (1968), "the law has become well-established that during a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation," United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004), without running afoul of the Fourth Amendment. "Any further investigative detention, however, is beyond the scope of the Terry stop and, therefore, illegal unless the officer has a reasonable suspicion of other criminal activity or the individual consents to the further detention."

6

Id. The Supreme Court has held that a drug-dog sniff is not a "search" as that term is used in the Fourth Amendment. United States v. Place, 462 U.S. 696, 706-07 (1983). In order to perform the sniff, however, "there must be a seizure of the vehicle and, therefore, the person, requiring either consent to be detained or reasonable suspicion." Foreman, 369 F.3d at 781.

Turning to Whitney's first argument, we agree with the district court that the initial traffic stop ended when Agent Canady returned Whitney's license. Under Florida v. Bostick, 501 U.S. 429 (1991), a police/citizen encounter is not consensual and triggers Fourth Amendment scrutiny if "the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Id. at 439. This inquiry is "an objective analysis of the totality of the circumstances." United States v. Meikle, 407 F.3d 670, 672 (4th Cir. 2005).

In Meikle, we noted that "we have repeatedly found to be consensual encounters" traffic stops in which the individual's license and registration had been returned. Id. at 673. For instance, in Meikle, the officer had returned Meikle's papers and shaken his hand, and Meikle, who was standing by the police car, began walking back to his vehicle. The officer then asked if they could speak again, and Meikle said yes. Eventually, Meikle consented to a search of his vehicle,

7

revealing three kilograms of heroin. Id. at 671-72. In finding the search "purely consensual," this Court noted that Meikle "understood that he was free to leave," in part because "[t]he officer had . . . returned all of Meikle's papers." Id. at 673-74. See also United States v. Farrior, 535 F.3d 210, 219 (4th Cir. 2008) (noting that the act of returning a license and registration "strongly indicates that the encounter was consensual and that no seizure occurred within the meaning of the Fourth Amendment"); United States v. Rusher, 966 F.2d 868, 872 (4th Cir. 1992) (upholding a search as consensual when the officer issued a warning, returned Rusher's driver's license and informed him that he was "free to go" before seeking consent to search his vehicle, even though driver was seated in the officer's patrol car at the time his license was returned and the questioning began).

Likewise, in United States v. Sullivan, 138 F.3d 126, 129 (4th Cir. 1998), the officer stopped Sullivan for driving without a front license plate. During the stop, Sullivan admitting to having an unpaid ticket; after attempting to confirm this statement, the officer eventually returned to Sullivan's car, handed back his license and registration, and informed him to replace the license plate and take care of the unpaid ticket. Id. at 129. The officer continued to believe that "something else [was] wrong," and, after returning

Sullivan's papers, began asking him if he had anything illegal in the vehicle. Id. Sullivan started acting nervous, and the officer continued to repeat the question six times for roughly one minute until Sullivan finally replied that he had a gun. Id. Reversing the district court, we found the encounter consensual. Id. at 133-34. In so concluding, this Court relied on the fact that Sullivan "remained in his own car throughout the dialogue," and that the officer had returned Sullivan's license and registration, "thus ending the traffic stop and affording Sullivan the right to depart." Id. at 133. That Sullivan had not been told he was free to go "alone [was] not dispositive," particularly because Sullivan was not coerced or physically touched or threatened during the encounter. Id. at 133-34.

In light of this consistent precedent, the district court did not err in concluding that Whitney consented to further questioning at the end of the traffic stop. First, Whitney's license and registration were returned to him, a significant indication that he was free to go. Moreover, there is no indication that Agent Canady threatened or made a show of authority to prompt Whitney to exit the car. And, while Whitney was asked to exit his vehicle, in Meikle and Rusher, we found similar encounters to be consensual even though the drivers were not in their cars at the time further questioning commenced. In

9

sum, the totality of the circumstances indicates that Whitney consented to exiting his car and continuing his conversation with Agent Canady after Agent Canady concluded the traffic stop.

In the alternative, Whitney argues that, once he refused consent to search his car, Agent Canady lacked reasonable suspicion to detain Whitney until a drug dog arrived on the scene. In rejecting this argument, the district court concluded that the large amount of cash in Whitney's pockets, in combination with his nervous behavior, created reasonable articulable suspicion, and we agree.

Under the Terry standard, an officer must have "reasonable suspicion that criminal activity is afoot" to perform a brief investigatory stop. Foreman, 369 F.3d at 781. This standard "is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life on which reasonable and prudent persons, not legal technicians, act." Id. Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

We have previously indicated that a motorist's extreme nervousness could help provide reasonable suspicion. See Foreman, 369 F.3d at 785 (citing United States v. Lebrun, 261

10

F.3d 731, 734 (8th Cir. 2001)).  In addition, courts have found that carrying large sums of cash can create reasonable suspicion.  See, e.g., United States v. Chhien, 266 F.3d 1, 8-9 (1st Cir. 2001) (concluding that discovery of $2000 in cash during traffic stop supported determination of reasonable suspicion and justified a brief period of further detention); Conrod v. Davis, 120 F.3d 92, 97 (8th Cir. 1997) (concluding that discovery of $6000 cash in individual's pocket and $4000 in suitcase furnished reasonable suspicion).

Accordingly, given Whitney's nervous demeanor and the large amount of cash found in his pockets, Agent Canady possessed sufficient reasonable suspicion to detain Whitney for a short period until the canine unit arrived.

## III.

For the foregoing reasons, the district court's judgment is affirmed.  We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.

AFFIRMED

11