**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-4280**

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

          v.

KENNETH J. JOHNSON, a/k/a K-9,

                    Defendant - Appellant.

Appeal from the United States District Court for the District of
South Carolina, at Charleston.  David C. Norton, Chief District
Judge.  (2:07-cr-00924-DCN-3)

Argued:  October 28, 2010            Decided:  January 31, 2011

Before NIEMEYER and GREGORY, Circuit Judges, and Damon J. KEITH,
Senior Circuit Judge of the United States Court of Appeals for
the Sixth Circuit, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** John Christopher Mills, Columbia, South Carolina, for
Appellant.  Jimmie Ewing, OFFICE OF THE UNITED STATES ATTORNEY,
Columbia, South Carolina, for Appellee.  **ON BRIEF:** William N.
Nettles, United States Attorney, Columbia, South Carolina, for
Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case arises out of the conviction of Defendant Kenneth Johnson for 1) conspiring to distribute and distributing five kilograms or more of cocaine and fifty grams or more of cocaine base in violation of 21 U.S.C. § 846; and 2) possession with intent to distribute and distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Johnson comes before this Court to contest the trial court's consideration of various pieces of evidence and the court's ultimate sentencing determination. For the reasons discussed below, we AFFIRM the trial court's decision.

**BACKGROUND**

On January 15, 2005, Kenneth Johnson, a South Carolina, resident, was released from federal prison, after being incarcerated for drug and firearms offenses committed in 1992 and a subsequent conviction for distributing cocaine, committed while he was imprisoned.

Shortly after midnight on November 5, 2006, Obie Pittman, a deputy with the Berkeley County, Sherriff's Office approached a Hardee's/Hot Spot restaurant/gas station. The building had a Hardee's Restaurant ("Hardee's") on one side of the building and a Hot-Spot gas station on the other side. The Hardee's had closed, but as the Hot-Spot was open 24 hours, it remained open.

2

Pittman observed two cars parked side by side in the parking lot, near the entrance to the Hardee's. Upon further inspection Pittman saw that the two cars were parked crookedly in a manner which conflicted with the parking spots delineated by the lines drawn in the parking lot. Though both of the cars' motors were running, two individuals were seated in one car, while the other was empty. Pittman later testified that he was aware of at least two other drug transactions that had taken place in the same parking lot.

Pittman, shortly thereafter, pulled into the lot, parking his vehicle behind the two cars in such a manner that Johnson attests he could not have moved his car if he tried. Shortly after Pittman parked his vehicle, Johnson exited the vehicle in which he and John Belton had been sitting. Johnson informed Pittman that he was taking care of some business and that their activities were legitimate. When asked by Pittman as to the nature of the business, Johnson provided him a card with the name "Affordable Car Wash" written on it. Pittman exited his car and walked over to the vehicle in which Belton remained seated. Upon reaching the car, Pittman asked Belton for identification. When Belton was unable to present any, Pittman asked him to exit the car. As Belton exited the car, Pittman observed a sum of money on the floor of the car between the

3

passenger seat and the door. When questioned as to its source, Belton stated that it must have fallen out of his pocket.

Pittman then performed a brief pat down search of both Johnson and Belton. In Johnson's pocket, Pittman felt a large sum of money which Pittman stated was approximately $2,000. Pittman additionally felt two other lumps on Johnson which he also believed were money. Nothing was seized from Johnson at the time.

Pittman then asked Johnson for his consent to search his vehicle – the car in which Johnson and Belton had been seated. When Johnson refused, Pittman obtained from his car a police detection dog. Upon being walked around Johnson's car, the dog signaled the presence of unlawful substances inside the passenger-side door. Pittman additionally observed clear plastic wrap partially hidden underneath the floorboard between the front passenger seat and the rear passenger seat.

Pittman conducted a search of the vehicle and located a package under the front passenger seat. The package contained nine individual plastic bags of cocaine, wrapped in plastic wrap and dryer sheets, with a total approximate weight of 276.1 grams. Pittman subsequently arrested Belton and Johnson. A search of their persons revealed $432.22 in cash on Belton and $3,957.50 on Johnson.

4

A subsequent search of Johnson's house, performed pursuant to a search warrant, revealed $9,768 in a small, draw-string bag in a closet of the home's master bedroom. The money was in the following denominations: 208 one-dollar bills, 3 twenty-dollar bills, 48 fifty-dollar bills, and 71 one-hundred dollar bills. The money found constituted almost half of Johnson's annual reported income of $21,000 per year.

After he was indicted, Johnson, via a pre-trial motion, challenged both his stop on the morning of November 5 and the sufficiency of the evidence supporting the warrant to search his house. The court rejected both motions finding that Pittman had reasonable cause for the stop and, while the application requesting the warrant included an error, it was minor and therefore, did not affect the warrant's validity.

At trial, the prosecution presented multiple witnesses who stated that they purchased cocaine and other drugs from the defendant. Belton testified that he had purchased marijuana and multiple kilograms of cocaine from Johnson. He specifically posited that on the night in question, he had arranged to meet with Johnson to repay him for a drug related debt he had built during the process of purchasing drugs from Johnson. Rias Richardson similarly testified that he regularly bought drugs from an individual he believed worked for Johnson. According to Richardson, on one occasion, Johnson directly sold him four and

5

one-half ounces of cocaine. Anthony Gordon testified that he regularly purchased drugs for Henry Bennett from Johnson. On one occasion, acting on behalf of Bennett, he purchased twelve kilograms of cocaine. He testified that Bennett had specifically sent him to Johnson when Bennett's usual source did not have drugs. Juan Brown testified regarding a number of purchases of cocaine, ranging in quantities of nine ounces to multiple kilograms, from Johnson. Benjamin Jenkins testified that he, likewise, had received three or four kilograms from Johnson on one occasion at Bennett's home.

Johnson called Drug Enforcement Agent Brendan McSheehy as a witness and questioned him regarding his investigation of the drug conspiracy. On cross examination, McSheehy stated that the cell phone seized from Johnson's home included contact information for Gordon, Brown, and Bennett. Additionally, he stated that an address book found in a duffel bag belonging to Bennett included Johnson's telephone number. McSheehy also provided testimony regarding statements Gordon had made indicating that he had previously failed to implicate Johnson because he feared for his and his family's safety.

Johnson additionally testified in his own defense. On the stand, Johnson denied that the drugs found in his car on November 5 were his or that he was involved in a conspiracy to distribute cocaine. He asserted that Belton planted the drugs

6

found in his car. Furthermore, he denied that he agreed to meet Belton so that he could pay back a drug-related debt.

The jury found Johnson guilty. After considering Johnson's string of prior convictions for drug-related offenses, the trial judge sentenced Johnson to life in prison. Johnson timely appealed his conviction raising a variety of evidentiary and sentencing-related issues.

## DISCUSSION

Johnson raises seven arguments on appeal. He specifically asserts that the trial court erroneously: 1) denied his motion to suppress the results of Pittman's November 5, 2006 search of his car; 2) denied his motion to suppress the results of the search of his home; 3) admitted McSheehy's testimony regarding Gordon's out of court statements; 4) admitted Johnson's prior convictions; 5) admitted evidence regarding Johnson's distribution of marijuana and heroin; 6) denied his motion for a new trial as a result of statements the prosecutor made during trial; and 7) sentenced him to life in prison.

## I. PITTMAN HAD REASONABLE CAUSE TO STOP JOHNSON ON THE MORNING OF NOVEMBER 5, 2006.

Johnson, on appeal, argues that Pittman violated his Fourth Amendment rights on the morning of November 5 when Pittman

7

parked his car behind Johnson's. For the reasons discussed below, the district court correctly denied Johnson's motion.

## A. Standard of Review

In reviewing a district court's denial of a pretrial motion to suppress evidence, this Court reviews the district court's factual findings for clear error and its legal conclusions de novo. Ornelas v. United States, 517 U.S. 690, 695-96 (1996); United States v. Sullivan, 138 F.3d 126, 131 (4th Cir. 1998). The evidence is construed in the light most favorable to the government. United States v. Perkins, 363 F.3d 317, 320 (4th Cir. 2004).

## B. Analysis

### 1. A Seizure Occurred When Pittman Blocked Johnson's Car.

The parties initially dispute at what point Pittman was required to have had a reasonable suspicion that Johnson was involved in criminal activity. Johnson asserts that he was seized for the purposes of the Fourth Amendment once Pittman parked his car behind Johnson's and therefore, Pittman must have had reasonable suspicion at that point to have acted within the confines of the Fourth Amendment. The government raises two arguments in Pittman's defense. First, it argues that no seizure occurred until Pittman frisked Johnson. Alternatively, it argues that even if a seizure occurred, no reasonable

8

suspicion was required given the circumstances.  We find neither argument persuasive.

"[A] Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied." Brower v. County of Inyo, 489 U.S. 593, 596-597 (1989) (emphasis deleted).  The government presents no argument in response to Johnson's assertion that Pittman, by pulling in behind him, blocked Johnson's car from leaving. Rather, in response it relies solely on the Fourth Circuit's decision in United States v. McCoy, 513 F.3d 405 (4th Cir. 2008) in which the court held that the defendant in the case was not seized until he was frisked.  McCoy is clearly distinguishable. Unlike this case, the officer, in *McCoy*, had taken no actions prior to the frisk to prevent the defendant from believing he was not "free to leave".  Id. at 411-412.

Nor do we accept the government's arguments that the Fourth Amendment does not require "reasonable suspicion" under the circumstances in this case.  The government in support of its argument relies on a series of "special circumstances" cases in which courts have held that reasonable suspicion is not required.  Examples of such circumstances include check points set up to catch drunk drivers and undocumented immigrants. Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 450, (1990); United States v. Martinez-Fuerte, 428 U.S. 543, 556

9

(1976).   The government presents no case, nor can I find any that allows the government to conduct such seizures outside of the context of traffic checkpoints or some other "special circumstance" (airports, schools, the border, etc.).   See e.g., United States v. Brugal, 209 F.3d 353 (4th Cir. 2000) ("The Supreme Court has also recognized that a state has a substantial interest in enforcing licensing and registration laws, though that interest is not substantial enough to justify roving patrol stops as an enforcement mechanism.").

**2. The Seizure Was Supported by Reasonable Suspicion.**

Whether there is reasonable suspicion to justify the stop depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences he could have drawn at the time of the stop. United States v. Sokolow, 490 U.S. 1, 8 (1989). Reasonable suspicion may exist even if "each individual factor 'alone is susceptible of innocent explanation.'" United States v. Black, 525 F.3d 359, 366-67 (4th Cir.) (quoting United States v. Arvizu, 534 U.S. 266, 277 (2002)), cert. denied, 129 S. Ct. 182 (2008). The reasonable suspicion determination is a "commonsensical proposition," and deference should be accorded to police officers' determinations based on their experience of what transpires on the streets. United States v. Foreman, 369 F.3d

776, 782 (4th Cir. 2004); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993).

The Supreme Court has recognized that factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion. Sokolow, 490 U.S. at 9 ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."). The articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied. Foreman, 369 F.3d at 781.

This admittedly is a close case. Of particular concern is the short period of time Pittman waited before blocking Johnson's car. However, we agree that the circumstances viewed in the light most favorable to the government support the conclusion that Pittman had reasonable suspicion to stop Johnson. It is undisputed that Pittman saw two cars after midnight sitting together in a dark area of a parking lot, next to a closed restaurant. Additionally, while the motors were running in both cars, both individuals were seated in one of them. Furthermore, Pittman had reason to believe criminal activity was afoot as he was personally aware of drug transactions having taken place in the specific parking lot on

11

at least two prior occasions.  See United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). ("[A]n area's propensity toward criminal activity is something that an officer may consider."). The Fourth Circuit has found reasonable suspicion based on less. See United States v. Whitney, 2010 U.S. App. LEXIS 17300, *12 (4th Cir. Aug. 17, 2010) ("[G]iven Whitney's nervous demeanor and the large amount of cash found in his pockets, Agent Canady possessed sufficient reasonable suspicion.").

Johnson, on appeal, relies primarily on United States v. McCoy.  The McCoy court found that reasonable suspicion existed where the officer: 1) saw the defendant sit in his car for several minutes; 2) saw the defendant arrange to meet a tow-truck driver at another location; 3) saw the defendant enter the tow truck; and 4) saw the tow-truck drive away quickly when the officer motioned for him to stop.  513 F.3d at 412-13.  Johnson posits that unlike in McCoy, Pittman did not observe any evasive behavior nor did Pittman wait long enough to see if Johnson or Belton took any actions indicative of criminal activity.  While these are important points, there were other circumstances in this case, such as the fact that the store was closed, both persons were parked in a dark area of the lot away from the open store, both persons were seated in one car despite the fact that both engines were running and the time of day, which together

were sufficient to support a reasonable suspicion of criminal activity.

**II.** **THE WARRANT FOR THE SEARCH OF JOHNSON'S HOME WAS PROPERLY ISSUED.**

Johnson argues, as a contingent matter, that because Pittman's stop of Johnson was unlawful and the evidence that was found during the stop constituted the basis for the warrant to search his house, the warrant was likewise erroneously granted. As noted, because we find no merit to Johnson's argument regarding the legitimacy of the stop, we likewise, find no merit to his objection to the evidence supporting the warrant to search his home.

**III. MCSHEEHY'S TESTIMONY RECOUNTING ANTHONY GORDON'S STATEMENTS WAS PROPERLY ADMITTED.**

Johnson additionally appeals the district court's admission of McSheehy's testimony regarding statements by Anthony Gordon, one of Johnson's co-conspirators, that he previously failed to admit that he purchased drugs from Johnson because he feared for his family's safety. Johnson contests the admission of McSheehy's testimony on the grounds that the government failed to notify Johnson before trial that he sought to introduce the evidence and, accordingly, the court never had the proper opportunity to determine whether the evidence was unfairly

13

prejudicial. Johnson, alternatively, argues that had the court considered the evidence it would have determined that it was impermissible character evidence in violation of Rule 404(b) of the Federal Rules of Evidence.

**A. Standard of Review**

Johnson concedes he failed to object to the admission of the aforementioned evidence at trial. When a party fails to object to the admission of evidence, Rule 103(d) of the Federal Rules of Evidence requires that the Court review the admission for plain error. Cook v. American Steamship Co., 53 F.3d 733, 742 (6th Cir. 1995); United States v. Brown, 287 U.S. App. D.C. 316, 921 F.2d 1304, 1308 n.4 (D.C. Cir. 1990); FED.R.EVID. 103(d).

**B. Analysis**

**1. The Court Properly Admitted the Testimony Despite the Fact that the Government Did not Notify the Court Before Trial.**

Johnson initially complains that the government improperly admitted McSheehy's testimony regarding Gordon's statements despite informing the court before trial that it would not present police testimony of co-conspirators' out of court statements. Accordingly, Johnson argues, the government should have been estopped from presenting such evidence at trial.

As the government correctly notes, the prosecution introduced the contested evidence only after Johnson raised the issue during his direct examination of McSheehy. During

14

Johnson's direct examination of McSheehy, Johnson's counsel asked McSheehy: "Did you ever have the opportunity to talk to Anthony Gordon? . . . [D]id he ever mention Kenneth Johnson?" J.A. at 412. Later, Johnson's counsel asked McSheehy whether any of the co-conspirators outside of Belton or Richardson "had ever mentioned Kenneth Johnson?" J.A. at 421.

The prosecution on cross-examination closely limited its questioning of McSheehy regarding Gordon's statements to the scope of Johnson's direct – it simply allowed McSheehy the opportunity to present Gordon's explanation as to why he had not mentioned Johnson previously.

Accordingly, given that Johnson opened the door for such evidence, we do not believe that the court's admission of it was in "plain error."

### 2. The Testimony Was Not "Character" Evidence.

Johnson alternatively, argues that had the court weighed the evidence it would have determined it was inadmissible under Rule 404(b) of the Federal Rules of Evidence.

Rule 404(b) forbids the admission of evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." FED. R. EVID. 404(b). This prohibition reflects the

> underlying premise of our criminal justice system, that the defendant must be tried for what he did, not for who he is. Thus, guilt or innocence of the accused

15

> must be established by evidence relevant to the particular offense being tried, not by showing that the defendant has engaged in other acts of wrongdoing.

United States v. Bradley, 5 F.3d 1317, 1320 (9th Cir. 1993) (internal quotation marks and citations omitted). Because such evidence may be highly relevant, however, the Rule does permit its admission "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident . . . ." FED. R. EVID. 404(b).

Rule 404(b) is inapplicable to McSheehy's testimony. As noted above, the rule relates to "other crimes, wrongs, or acts." McSheehy introduced no evidence of acts, words or threats in other forms by Johnson, but merely provided Gordon's statements regarding his personal feelings of fear. Furthermore, the testimony was not introduced to prove Johnson's character, but rather to explain why Gordon lied. See United States v. Green, No. 08-2330, 2010 U.S. App. LEXIS 16431, *46, n.16 (3rd Cir. Aug. 9, 2010) ("The required proper purpose was the rehabilitation of Stahl's credibility, in light of Green's suggestions that she was motivated by money and cooperated solely for selfish reasons.").[*]

---

[*] At the end of the relevant section of his brief, Johnson throws in a one-line argument that the statement was hearsay. An out of court statement is only hearsay if it is presented to prove the truth of the matter asserted. FED. R. EVID. 801(c). As noted above, in this case, the statement was not presented to (Continued)

16

**IV. THE DISTRICT COURT DID NOT ERR IN ADMITTING EVIDENCE OF JOHNSON'S PRIOR CONVICTIONS FOR COCAINE DISTRIBUTION.**

Johnson also argues that the court erroneously admitted evidence of his previous cocaine distribution convictions. He specifically argues: 1) that the evidence served no legitimate purpose other than defaming his character; and 2) was unduly prejudicial.

**A. Standard of Review**

The court reviews a district court's determination regarding the admissibility of evidence under Rule 404(b) for abuse of discretion. United States v. Greenwood, 796 F.2d 49 (4th Cir. 1996); United States v. Hodge, 354 F.3d 305, 312 (4th Cir. 2004). A court abuses its discretion when it "act[s] arbitrarily or irrationally in admitting evidence." United States v. Basham, 561 F.3d 302, 326 (4th Cir. 2009) (internal quotation marks omitted).

**B. Analysis**

The Fourth Circuit has set out a four part test courts must use when determining whether evidence of prior bad acts may be admitted. The prior act must: 1) be relevant to an issue other than character, such as intent, motive or knowledge; 2) be

---

prove that Johnson was in fact dangerous but merely to explain why Gordon had previously provided inconsistent testimony.

17

necessary to prove an element of the crime charged; 3) be reliable; and 4) not be substantially outweighed by its prejudicial nature. United States v. Queen, 132 F.3d 991, 995 (4th Cir. 1997). This court has held that "Rule 404(b) is 'an inclusive rule, admitting all evidence of other cimes or acts except that which tends to prove *only* criminal disposition.'" United States v. Rooks, 596 F.3d 204, 211 (4th Cir. 2010) (quoting United States v. Young, 248 F.3d 260, 271-72 (4th Cir. 2001)). As noted, Johnson specifically challenges prongs one and four of this analysis.

The government asserted and the court below agreed that the evidence was relevant to Johnson's intent upon arriving at the parking lot on the morning of November 5th; his knowledge of the drug trade; absence of mistake; plan; and opportunity. The district court's rulings with regard to intent and knowledge were consistent with the law of this Circuit. Rooks, 596 F.3d at 211 (affirming admission of evidence of prior narcotics conviction to establish the defendant's knowledge of drug trafficking and intent to distribute drugs found at the crime's scene).

Likewise, because the statements were accompanied by limiting instructions, under the Fourth Circuit's jurisprudence the convictions' admission was not unduly prejudicial. Id. ("[T]he evidence [of prior convictions] was neither unreliable

18

nor unfairly prejudicial, especially in light of the court's limiting instruction to the jury."). See United States v. White, 405 F.3d 208, 213 (4th Cir. 2005) ("[A]ny risk of such prejudice was mitigated by a limiting instruction from the district court clarifying the issues for which the jury could properly consider [the] evidence.").

## V. THE TRIAL COURT DID NOT COMMIT PLAIN ERROR IN ALLOWING TESTIMONY THAT JOHNSON DEALT HEROIN AND MARIJUANA.

Johnson, likewise, challenges the admission of testimony that he also distributed marijuana and heroin as improper character evidence.

### A. Standard of Review

Johnson failed to object to the government's statement below. Accordingly, this Court's review is limited to the plain error standard discussed above.

### B. Analysis

Johnson alleges that testimony regarding him dealing other drugs constituted impermissible character evidence.

Rule 404(b) protects only against the introduction of extrinsic act evidence when offered to prove character. Evidence when not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if it forms an integral and natural

19

part of an account of the crime, or is necessary to complete the story of the crime for the jury. <u>United States v. Powers</u>, 59 F.3d 1460 (4th Cir. 1994). In such a situation, because the evidence is intrinsic, not extrinsic, we do not engage in a Rule 404(b) analysis.

Here, it is clear that the testimony concerning other drugs Johnson was distributing while distributing cocaine was intrinsic to the crime. Belton testified that when he was introduced to Johnson, it was for the purpose of conducting drug transactions and while he initially purchased marijuana, they gradually moved on to other drugs such as heroin and cocaine. Given that the testimony showed that Johnson was distributing heroin and marijuana to many of his co-conspirators during the course of the cocaine conspiracy, the evidence was intrinsic and, therefore, not subject to analysis under 404(b).

Such evidence is, of course, nevertheless subject to a Rule 403 balancing. <u>See</u> <u>United States v. Huppert</u>, 917 F.2d 507 (11th Cir. 1990). "[T]he court's discretion to exclude evidence under Rule 403 is narrowly circumscribed. 'Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence.'" <u>United States v. Norton</u>, 867 F.2d 1354, 1361 (11th Cir.), <u>cert. denied</u>, 491 U.S. 907 (1989). Beyond blank accusations that the evidence was prejudicial, Johnson presents

20

no specific argument in support of his assertion that the prejudicial effect of this information outweighed its relevance. Accordingly, we cannot find that the court's admission of such was clear error.

**VI. THE TRIAL COURT PROPERLY DENIED JOHNSON'S MOTION TO OVERTURN HIS CONVICTION AS A RESULT OF THE PROSECUTOR'S STATEMENT.**

Johnson additionally challenges the trial court's refusal to grant Johnson a new trial as a result of the prosecutor's statement during closing arguments referring to Johnson as the devil.

**A. Standard of Review**

Johnson failed to object to the government's statement below. Accordingly, this Court's review is limited to the plain error standard discussed above.

**B. Analysis**

The court examines a claim of prosecutorial misconduct to determine whether the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Scheetz, 293 F.3d 175, 185 (4th Cir. 2002) (addressing prosecution's improper reference to evidence admitted only against one defendant in closing argument arguing that another defendant was guilty) (citations and internal quotation marks omitted). "The test for reversible

21

prosecutorial misconduct has two components; first, the defendant must show that the prosecutor's remarks or conduct were improper and, second, the defendant must show that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial." Id.

The Fourth Circuit has set out a variety of factors that courts must consider when evaluating the prejudicial effect of a statement. These include: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. United States v. Mitchell, 1 F.3d 235, 241 (4th Cir. 1993).

At issue on appeal is the prosecutor's statement during closing arguments that "when you put the devil on trial, you've got to go to hell to get your witnesses." The government defends the statement on the grounds that it was merely a "colorful" way of saying that the prosecution had to use unsavory witnesses to convict the defendant.

We cannot accept the government's argument that the statement was merely a colorful statement. It is clear from the record that the government was specifically referring to Johnson

22

when it made the statement. While the prosecution may have been trying to defend its use of certain witnesses, inherent in the statement was an emotional characterization of the defendant. See Fahy v. Horn, 516 F.3d 169, 202 (3rd Cir. 2008) ("We do not condone the characterization of [the defendant] as demonic, nor consider it a proper form of argument."); United States v. Whittington, 269 Fed. Appx. 388, 410 (5th Cir. 1998) ("The prosecutor's remarks cannot be characterized as simply a colloquialism because he appeared to be referring to [the defendant] in each statement. We assume without deciding that referring to a defendant as 'the devil' is improper.").

That said, we do not find that the single remark, by itself, rendered the trial fundamentally unfair. Given that the statement's principal function was to explain the witnesses' criminal backgrounds and it was an isolated remark, we cannot find the trial court's allowance of the statement constituted plain error. See Whittington, 269 Fed. Appx. at 411-12 (finding similar statement negatively impacted the jury, but because "the specific wording of the statement was designed to explain the plea agreements that the government made with unsavory characters that testified against [the defendant]," allowing the statement did not constitute clear error).

23

**VII. THE TRIAL COURT DID NOT ERR BY SENTENCING JOHNSON TO A LIFE SENTENCE.**

Finally, Johnson alleges the trial court's sentence of life in prison for Johnson violated the Eighth Amendment's prohibition on cruel and unusual punishment. Johnson asserts that the trial court failed to conduct the appropriate proportionality analysis set out in United States v. Kratsas, 45 F.3d 63 (4th Cir. 1995) and Solem v. Helm, 463 U.S. 277 (1983). Had the court conducted the proper balancing, Johnson continues, it would have found that given the small amount of cocaine at issue in his prior sentence and the length of the sentence, a life sentence was not appropriate.

**A. Standard of Review**

The Court reviews de novo an appellant's constitutional challenge to the proportionality of his sentence. United States v. Meyers, 280 F.3d 407, 416 (4th Cir. 2002).

**B. Analysis**

Section 841(b) of Title 21 of the United States Code provides for a mandatory life sentence without release for participants in certain drug offenses involving five or more kilograms of cocaine. Specifically, the statute provides:

> If any person commits a violation of this subparagraph or of section 859, 860, or 861 of this title after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release .  . . .

24

21 U.S.C. § 841(b)(1)(A).

Johnson does not dispute having two applicable prior felony convictions for the purposes of section 841(b). Rather, he asserts that given the small amount of drugs and how old the conviction was, a sentence of life was disproportionate under the Eighth Amendment.

Johnson misreads the Fourth Circuit's decision in United States v. Kratsas. The court not only did not find that a proportionality balancing was not required, but in fact held the opposite – a court need not consider any mitigating factors when issuing a sentence under section 841(b). See Kratsas, 45 F.3d at 69 ("[I]t is clear that a sentence of life without parole does not require the consideration of mitigating factors, as is required in the death penalty context, in order to pass constitutional muster. Thus, the mere fact that the life sentence was mandatorily imposed does not render it "cruel and unusual." (citations omitted)).

Accordingly, the sentence did not violate the Eighth Amendment under the Fourth Circuit's jurisprudence.

## CONCLUSION

For the aforementioned reasons, the trial court's conviction and sentence of Johnson is, hereby,

AFFIRMED.

25